**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

MONICA MCDONALD HOOGE                          CIVIL ACTION

VERSUS                                          18-1112-SDD-RLB

UNION PACIFIC RAILROAD COMPANY,
LOUISIANA RAILROAD ASSOCIATION,
CARMACK BLACKMON

**<u>RULING</u>**

The matters before the Court are the *Motion for Summary Judgment*[1] by Defendant

Union Pacific Railroad Company ("UP") and the *Motion for Summary Judgment*[2] by

Defendants Carmack Blackmon ("Blackmon") and Louisiana Railroad Association

("LRA"). Plaintiff Monica Hooge ("Hooge") filed an *Opposition*[3] to each motion.

Defendants filed a *Reply*[4] and Plaintiff filed a *Sur-Reply*[5] to UP's *Reply*. The Court has

subject-matter jurisdiction over this matter under 28 U.S.C. §1331.[6] For the following

reasons, the Court will deny both *Motions*.

**I.    FACTUAL BACKGROUND**

This case is a Tile VII claim for sexual harassment by Hooge against UP,

Blackmon, and LRA. Blackmon is a registered lobbyist and attorney with decades of

experience representing railroads.[7] To conduct these lobbying activities, Blackmon

---

[1] Rec. Doc. 30.
[2] Rec. Doc. 36.
[3] Rec. Doc. 35; Rec. Doc. 42.
[4] Rec. Doc. 39-1; Rec. Doc. 49.
[5] Rec. Doc. 48.
[6] Rec. Doc. 1 ¶5.
[7] Rec. Doc. 30-1 p. 3.
60029

formed the LRA, which is an unincorporated association.[8] LRA generates revenue through income from railroad companies that it represents, which are six Class I railroads and six short line railroads.[9] Each railroad pays a base fee to LRA for representation, plus an extra sum that depends on the length of track maintained by the railroad in Louisiana.[10] Further, LRA is governed by an Executive Committee consisting of representatives from LRA's railroad clients. While the extent of control is disputed, the Executive Committee directs some portion of the affairs of LRA, such as by approving a yearly budget.[11]

LRA leased an office in which Blackmon and Hooge worked, but the office was shared by Cole Tessier ("Tessier"), who was employed by UP since 2005 as the Director of Public Affairs for UP and the Chairman of the LRA Executive Committee.[12] Rhonda Krueger ("Krueger"), who was employed as an Administrative Assistant, was not an occupant of the office; rather, Krueger assisted Tessier with administrative matters from Spring, Texas.[13] It is undisputed that Hooge was an employee of LRA and was supervised by Blackmon; however, it is disputed whether Hooge was an employee of UP and whether Hooge was supervised by Tessier.[14] While Hooge contends that she was hired to assist both Blackmon and Tessier and frequently performed administrative tasks for Tessier, UP maintains that only Blackmon had any authority for employment decisions as to Hooge and that Hooge rarely performed "minor clerical functions" for Tessier.[15]

---

[8] Rec. Doc. 30-1 p. 3.
[9] *Id.*
[10] *Id.*
[11] *Id.* p. 3-4.
[12] *Id.*; *see also* Rec. Doc. 42 p. 2.
[13] Rec. Doc. 30-1 p. 2.
[14] *Id.* p. 4-5.
[15] *Id.* p. 5; Rec. Doc. 35 p. 11.
60029

Hooge alleges that she was sexually harassed by Blackmon beginning in late 2015 and throughout her alleged employment.[16] Hooge alleges that she was harassed by Blackmon in the following ways: "(i) pulling her closer to him while standing next to her chair; (ii) pulling her into his lap; (iii) grabbing her breast; (iv) kissing her neck; (v) kissing her cheek very close to her mouth; (vi) giving her 'close, long,' and 'lingering' hugs; (vii) patting her rear; and (viii) approaching her from behind while she was sitting in her chair, squeezing her arms, and leaning over her shoulder to kiss the side of her neck."[17]

Hooge also alleges that she detailed the alleged abuse and communicated her discomfort in a letter dated May 30, 2017 addressed to Blackmon and Tessier. According to Hooge, Blackmon stopped the inappropriate touching after she sent the letter, "but began treating her very aggressively and disrespectfully including slamming books, papers, and doors in her presence."[18]

Hooge submitted a letter of resignation on July 10, 2017, but on July 12, 2017, Hooge allegedly told Blackmon that the letter was merely a draft intended to voice her concerns and not intended as a formal resignation.[19] Hooge claims that she withdrew the letter at Blackmon's instructions.[20] Hooge alleges that Blackmon and Tessier discussed her termination later that day, and after providing her with time off, terminated Hooge's employment in late July 2017.[21]

---

[16] Rec. Doc. 35 p. 2; *see also* Rec. Doc. 42 p. 2.

[17] Rec. Doc. 35 p. 2 (citing Rec. Doc. 35-2 p. 60, 158-162); *see also* Rec. Doc. 42 p. 2.

[18] *Id.* (citing Rec. Doc. 35-2 p. 173; Rec. Doc. 30-12 p. 17); *see also* Rec. Doc. 42 p. 2.

[19] *Id.* (citing Rec. Doc. 35-2 p. 131); *see also* Rec. Doc. 42 p. 2.

[20] *Id.* at p. 2-3 (citing Rec. Doc. 35-2 p. 35-36, 131; Rec. Doc. 35-3 p. 60, 68); *see also* Rec. Doc. 42 p. 2-3.

[21] *Id.* at p. 3 (citing Rec. Doc. 30-5 p. 128, Rec. Doc. 30-12 ¶18, Rec. Doc. 30-10); *see also* Rec. Doc. 42 p. 3.

60029

Hooge filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on January 16, 2018, claiming that Blackmon sexually harassed her in violation of Title VII.[22] She was issued a right to sue letter on October 1, 2018 and subsequently filed suit on December 31, 2018.[23] UP filed its *Motion for Summary Judgment* on December 27, 2019,[24] and Blackmon and LRA filed their *Motion for Summary Judgment* on January 31, 2020.[25] The Court shall consider each motion in turn.

## II.    LAW AND ANALYSIS

### A.  Rule 56 Motion for Summary Judgment

In reviewing a party's Motion for Summary Judgment, the Court will grant the Motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[26] This determination is made "in the light most favorable to the opposing party."[27] The Court cannot engage in weighing the evidence or determining credibility, as those functions belong to a jury rather than the Court; thus, "[the Court] must disregard all evidence favorable to the moving party that the jury is not required to believe."[28] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[29] If the moving party satisfies its burden, "the non-moving party must show that

---

[22] Rec. Doc. 30-1 p. 11 (citing Rec. Doc. 30-12).

[23] Rec. Doc. 1; Rec. Doc. 30-12 p. 2-6.

[24] Rec. Doc. 30.

[25] Rec. Doc. 36.

[26] FED. R. CIV. P. 56(a).

[27] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).

[28] *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 135 (2000).

[29] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

60029

summary judgment is inappropriate by setting 'forth specific facts showing the existence

of a genuine issue concerning every essential component of its case.'"[30] However, the

non-moving party's burden "is not satisfied with some metaphysical doubt as to the

material facts, by conclusory allegations, by unsubstantiated assertions, or by only a

scintilla of evidence."[31]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.'"[32] All reasonable factual

inferences are drawn in favor of the nonmoving party.[33] However, "[t]he Court has no duty

to search the record for material fact issues. Rather, the party opposing the summary

judgment is required to identify specific evidence in the record and to articulate precisely

how this evidence supports his claim."[34] "Conclusory allegations unsupported by specific

facts . . . will not prevent the award of summary judgment; 'the Plaintiffs [can]not rest on

his allegations . . . to get to a jury without any "significant probative evidence tending to

support the complaint."'"[35]

### B. Title VII of the Civil Rights Act of 1964

Hooge's sole claim in this lawsuit arises under Title VII of the Civil Rights Act of

1964.[36] "Title VII makes it 'an unlawful employment practice for an employer . . . to

---

[30] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[31] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).

[32] *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[33] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).

[34] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) (citing *Ragas v. Tenn. Gas. Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

[35] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).

[36] 42 U.S.C. § 2000e-2(a)(1).

60029

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"[37] "The creation of a hostile work environment through harassment . . . is a form of proscribed discrimination."[38] Title VII claims may only be made against one's employer.[39] It is undisputed that Hooge has exhausted her administrative remedies, and her claims are ripe for consideration.[40] The Court now turns to the two motions for summary judgment filed by Defendants.

### C. UP's Motion for Summary Judgment

#### 1. Objections to Hooge's Declaration

UP objects to Hooge's attached declaration,[41] arguing that it does not comply with 28 U.S.C. § 1746 because it is not dated and is "made by [her attorney] Johnny Taylor, not by Plaintiff."[42] Hooge acknowledged the grounds for UP's objection in her *Sur-Reply*[43] and subsequently moved to substitute the declaration with a corrected one, which the Court granted.[44] The substituted declaration is clearly signed by Hooge and dated February 11, 2020 and meets the other requirements of 28 U.S.C. § 1746. UP's objection to the declaration as a whole is therefore OVERRULED.

UP also objects to individual portions of the declaration. First, UP objects to the following statement: "I did not volunteer to perform work for Mr. Tessier. I was required to

---

[37] *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 452 (5th Cir. 2013) (quoting 42 U.S.C. § 2000e-2(a)(1)).
[38] *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 452 (2013) (Ginsburg, J. dissenting)).
[39] 42 U.S.C. § 2000e(b); *Ackel v. National Communications, Inc.*, 339 F.3d 376, 382 (5th Cir. 2003).
[40] Hooge properly filed a charge with the EEOC. She was issued a right to sue letter on October 1, 2018 and filed suit on December 31, 2018. Rec. Doc. 30-12 p. 2-5, 6; Rec. Doc. 1.
[41] Rec. Doc. 35-12.
[42] Rec. Doc. 37 p. 9.
[43] Rec. Doc. 48 p. 1-2.
[44] See Rec. Doc. 40, Rec. Doc. 45.
60029

as part of my job."[45] UP argues this statement contradicts prior testimony by Hooge in which she stated, according to UP, that "she asked Tessier to provide her with work because she had nothing else to do."[46] UP argues that, if this was true, then Hooge "would not have had to ask for work to keep her busy. Tessier would have already been assigning her work."[47] This argument calls for speculation, and these statements do not plainly contradict one another, as Hooge could have been required to work for Tessier without being assigned work frequently. UP's objection to this statement is OVERRULED.

Second, UP objects to the following statement: "I am not aware of Mr. Tessier ever seeking, or being required to seek, 'permission' from Mr. Blackmon in order to assign a task to me."[48] UP objects on the grounds of relevance and personal knowledge.[49] This statement is relevant for Hooge's Title VII claim because it strikes at whether Tessier was Hooge's supervisor or a mere co-worker; its probative value is not outweighed by confusion or prejudice. UP's relevance objection is OVERRULED. However, Hooge fails to demonstrate that she has personal knowledge of whether Tessier was required to seek Blackmon's permission in order to assign work tasks. UP's personal knowledge objection is SUSTAINED, and this statement shall not be considered as summary judgment evidence by the Court.

Third, UP objects to the following statement: "Some time after July 12, 2017, but before I received my July 27, 2017 termination letter, I had a conversation with a man named 'Jim' who was on the pastoral committee at Live Oak United Methodist Church,

---

[45] Rec. Doc. 35-12 ¶10.
[46] Rec. Doc. 37 p. 9.
[47] *Id.*
[48] Rec. Doc. 35-12 ¶10.
[49] Rec. Doc. 37 p. 9 (citing FED. R. EVID. 403, 602).
60029

where I had applied for a job and was interviewed. Jim informed me that he had called the LRA after July 12, 2017 and was told that I was still employed there."[50] UP objects on the grounds of relevance and hearsay. The statement has little to no probative value that is outweighed by unfair prejudice, as the identity of the individual mentioned in the statement is unknown. Moreover, the statement is plain hearsay and does not meet any hearsay exceptions. UP's objection to this statement is SUSTAINED and the Court shall not consider this statement as summary judgment evidence.

### 2. Objection to Plaintiff's Audio Recording

In its *Reply*, UP objects to the recording transcript submitted as summary judgment evidence by Hooge, arguing that (1) the recording was made without Blackmon's consent in violation of the Electronic Surveillance Act, and (2) the recording is not properly authenticated.[51] Notwithstanding that the record evidence demonstrates a factual dispute as to Tessier's consent to record, the Court nevertheless finds the recording inadmissible on the current record.

"To be admissible [as summary judgment evidence], documents must be authenticated by and attached to an affidavit that meets the requirements of [Federal Rule of Civil Procedure] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."[52] UP argues that Hooge "has provided no evidence as to the type of device with which she made the recordings, the software used to make the recordings, where she maintained the recordings, how she transcribed the recordings,

---

[50] Rec. Doc. 35-12 ¶12.
[51] Rec. Doc. 37 p. 8.
[52] 10A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 2722, 59-60 (3d. ed. 2007) (citations omitted).
60029

and who else participated in transcribing the recordings."[53] However, Hooge submits her affidavit in which she attests that she made the recordings with her cell phone, that she participated in the preparation of the transcripts of the recordings, that the transcripts are accurate reproductions of the recordings, and that she recognizes and is able to identify the speakers in the transcription.[54] Additionally, Hooge's attached deposition provides that Hooge made the recordings using her phone.[55] Nonetheless, even setting aside the self-serving nature of Hooge's authentication evidence, Hooge does not provide evidence of how the transcript was preserved, the software used, or who prepared the transcript. Thus, the transcription is not properly authenticated. UP's objection to the transcript is SUSTAINED; the transcription of the recording shall not be considered by the Court as summary judgment evidence. This evidentiary ruling is without prejudice to Hooge's right to attempt to authenticate and offer the recording at trial.

3. <u>Is UP an Employer?</u>

UP contends that Hooge's Title VII claim should be dismissed because UP is not Hooge's employer. Specifically, UP argues that it and LRA are not joint employers. In response, Hooge concedes that Blackmon and LRA are not the same entity and that UP was Hooge's employer for Title VII purposes. However, Hooge maintains that UP and LRA operated as a single business enterprise; alternatively, Hooge argues that UP and LRA were joint employers under the economic realities or common law control test.

---

[53] Rec. Doc. 37 p. 8-9.
[54] Rec. Doc. 35-12 p. 3 ¶¶13-14.

60029

Title VII requires an employment relationship.[56] However, more than one entity may qualify as an employer for Title VII purposes through the single employer test and the joint employer test. To determine whether multiple entities constitute a single employer under Title VII, the Court considers: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership and financial control.[57] The second factor—centralized control of labor relations—is of primary importance,[58] and "the critical question to be answered then is: What entity made the final decisions regarding employment matters related to the person claiming discrimination?"[59] "Single employer status ultimately depends on 'all the circumstances of the case' and is characterized as an absence of an 'arm's length relationship found among unintegrated companies.'"[60]

UP argues that it and LRA "did not have any interrelation of operations. To the contrary, UP was one of [LRA's] clients."[61] Hooge argues that the interrelation of operations factor is met because UP and LRA shared an office space, office supplies, and a secretary; Hooge offers her own deposition and affidavit as summary judgment evidence to support this factor.[62] To have interrelated operations, it is not enough for companies to be merely "related or intertwined" for the purpose of conducting business.[63]

---

[56] *Hishon v. King & Spalding*, 467 U.S. 69, 74 (1984).

[57] *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983); *see also Nicholson v. Securitas Sec. Servs. USA, Inc.*, 830 F.3d 186, 189 (5th Cir. 2016) ("We use a four-part test to determine whether 'superficially distinct entities may be exposed to liability upon a finding they represent a single, integrated enterprise: a single employer.'") (quoting *Trevino*, 701 F.2d at 403-04).

[58] *Oaktree Capital Mgmt., L.P. v. NLRB*, 452 Fed.Appx. 433, 438 (5th Cir. 2011).

[59] *Trevino*, 701 F.2d at 404.

[60] *NLRB v. DMR Corp.*, 699 F.2d 788, 791 (5th Cir. 1983) (quoting *Local 627, Int'l Union of Operating Eng'rs v. NLRB*, 518 F.2d 1040, 1045-46 (D.C. Cir. 1975)).

[61] Rec. Doc. 30-1 p. 15.

[62] Rec. Doc. 35 p. 7-8 (citing Rec. Doc. 35-2 p. 191; Rec. Doc. 35-12 ¶2). Hooge alleges additional facts that weigh in favor of interrelation of operations under the common management factor. *See infra*, p. 14.

[63] *Davenport v. HansaWorld USA, Inc.*, 23 F.Supp. 3d 679, 693 (S.D. Miss. 2014).

60029

It is not even enough for entities to be in a parent-subsidiary relationship; for the interrelation of operations factor, UP and LRA must be "functionally integrated" such as by sharing employees, commingling bank accounts, maintaining records together, or sharing equipment.[64] Summary judgment evidence that supports the interrelation of operations factor includes evidence that UP "(1) was involved directly in [LRA's] daily decisions relating to production, distribution, marketing, and advertising; (2) shared . . . services, records, and equipment with [LRA]; (3) commingled bank accounts, accounts receivable, inventories, and credit lines; (4) maintained [LRA's] books; (5) issued [LRA's] paychecks; or (6) prepared and filed [LRA's] tax returns."[65] Hooge alleges that "[s]he performed work for both the LRA and Union Pacific on a daily basis throughout the entirety of her employment,"[66] including compiling briefing books,[67] taking phone messages,[68] setting up voicemail,[69] preparing expense reports,[70] printing and filing,[71] arranging meetings,[72] sending packages,[73] drafting letters,[74] and various other administrative tasks.[75] Hooge submits the depositions of herself and Tessier as well as her declaration as summary judgment evidence supporting these allegations. For summary judgment purposes, Hooge has presented summary judgment evidence demonstrating a disputed issue of material fact regarding whether LRA and UP were functionally integrated.

---

[64] *See Sullivan v. Scalable Software, Inc.*, 2005 WL 8165596 at *3-4 (S.D. Tex. June 9, 2005) (citing *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 777-78 (5th Cir. 1997)).

[65] *Id.* at 3.

[66] Rec. Doc. 35 p. 13.

[67] Rec. Doc. 35-3 p. 132-168; Rec. Doc. 35-2 p. 183-184; Rec. Doc. 35-12 ¶4.

[68] Rec. Doc. 35-2 p. 185; Rec. Doc. 35-3 p. 170-171.

[69] Rec. Doc. 35-2 p. 186.

[70] Rec. Doc. 35-4 p. 56-57; Rec. Doc. 35-12 ¶7.

[71] Rec. Doc. 35-2 p. 187; Rec. Doc. 35-5 p. 138, 174.

[72] Rec. Doc. 35-5 p. 175-178.

[73] *Id.* at p. 195.

[74] *Id.* at p. 182-183.

[75] *Id.* at p. 180-181, 183-194, 196-197.

60029

As for centralized control of labor relations, UP contends that "there is no evidence that UP made any employment decisions with respect to Hooge," and that "Blackmon hired Hooge and was the only person who had the power to terminate her employment."[76] Again, the centralized control of labor relations factor is the most important.[77] The centralized control factor inquires as to "'whether there exists overall control of critical matters at the policy level,' not whether there is control over day-to-day labor decisions."[78] It is undisputed that Tessier was acting on behalf of UP in his role at the company. Submitting Tessier's deposition as evidentiary support, Hooge argues that UP, through Tessier, had the authority to terminate Hooge.[79] Specifically, Hooge contends that Tessier played a role in firing Hooge by calling a meeting of the Executive Committee and by hiring an attorney to evaluate whether LRA had a duty to investigate Hooge's harassment allegation in her letter to Blackmon.[80] Hooge also maintains that Tessier "played a role in hiring her" and was the primary decisionmaker of her salary.[81] These facts support a finding that Tessier, and therefore UP, were involved in the "underlying decision-making process that resulted in the alleged unfair labor practices," which is "probative of centralized control of labor relations and single-employer status."[82] Tessier and Blackmon both testified that only Blackmon had the authority to fire Hooge.[83] Thus, there remains a question of fact as to the nature and extent of control, the resolution of which would

---

[76] Rec. Doc. 30-1 p. 15.
[77] *See Saulsberry v. Atlantic Richfield Co.*, 673 F.Supp. 811, 815 (N.D. Miss. 1987); *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir. 1986).
[78] *Alcoa, Inc. v. Nat'l Labor Relations Bd.*, 849 F.3d 250, 258 (quoting *Oaktree*, 452 Fed.Appx. at 438, 442).
[79] Rec. Doc. 35 p. 9-10.
[80] *Id.* (citing Rec. Doc. 35-4 p. 80).
[81] *Id.* at p. 10.
[82] *Alcoa*, 849 F.3d at 259.
[83] Rec. Doc. 30-3 p. 71-72; Rec. Doc. 30-4 p. 45.
60029

require the Court to engage in a credibility determination which is reserved for the fact-finder. Considering the controverted evidence, the Court cannot find that UP lacked control over the employment decisions as to Hooge.

Regarding the common management factor, UP argues that Blackmon had the authority to manage LRA's—and therefore Hooge's—affairs, but Blackmon had no ability to manage UP or its employees.[84] Hooge argues in response that "Hooge was required, as part of her job, to perform numerous tasks for Tessier,"[85] but Hooge's factual allegations are misplaced within this factor and weigh instead towards interrelation of operations discussed *supra*. The common management factor refers to whether LRA and UP share managing officials, such as officers, directors, or a president and is typically analyzed in the context of a parent-subsidiary relationship.[86] There is therefore no genuine issue of material fact as to the common management factor.

Finally, because "UP and Blackmon did not share a bank account, accounting records, payroll accounts, or personnel records," UP argues that it did not share common ownership and financial control with LRA.[87] Hooge argues in response that, because UP contributed more to LRA than any other railroad, UP was effectively in common ownership and financial control of LRA and Hooge.[88] Hooge restates that Tessier played a role in determining Hooge's salary.[89] Blackmon indicates in his deposition that, although LRA received a large portion of its funds from UP, Blackmon was able to control the finances

---

[84] Rec. Doc. 30-1 p. 16.
[85] Rec. Doc. 35 p. 11.
[86] *See Lusk*, 129 F.3d at 778; *see also Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1364 (10th Cir. 1993); *Johnson v. Flowers Industries, Inc.*, 814 F.2d 978, 981-82 (4th Cir. 1987).
[87] Rec. Doc. 30-1 p. 16 (citing Rec. Doc. 30-3 p. 74, Rec. Doc. 30-4 p. 19, Rec. Doc. 30-5 p. 190-191).
[88] Rec. Doc. 35 p. 13.
[89] Rec. Doc. 35 p. 14.
60029

of LRA in whatever way he wished.[90] As there is no common ownership or financial control shared between UP and LRA, Hooge has not demonstrated a genuine issue of material fact as to the common ownership or financial control factor.

In summary, the application of the interrelation of operations factor and the centralized control of labor relations factor are disputed facts, whereas the common management factor and the common ownership and financial control factor are not genuine issues of material fact. Much like the Fifth Circuit in *Alcoa*,[91] because the centralized control of labor relations factor is of primary importance, and because an additional factor weighs in favor of single employer status, the Court finds that Hooge has sufficiently demonstrated a genuine issue of material fact as to whether LRA and UP are a single employer. The Court need not reach the Plaintiff's alternative joint employer argument. The Court now turns to the elements of Hooge's sexual harassment claim.

### 4. Elements of Title VII Sexual Harassment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[92]  Sexual harassment is a form of sex discrimination. The Supreme Court has recognized two types of sexual harassment claims: those based on requests for sexual favors that result in adverse employment actions (a *quid pro quo* claim) and those where bothersome attentions or sexual remarks

---

[90] Rec. Doc. 30-3.

[91] *Alcoa*, 849 F.3d at 259 ("In sum, because there is substantial evidence showing common control over labor relations as well as interrelation of operations and common ownership, we hold the Board correctly determined that Alcoa and TRACO constitute a single employer.").

[92] 42 U.S.C. § 2000e–2(a)(1).

60029

create a hostile work environment.[93] It is undisputed that this matter involves an alleged hostile work environment.

To establish a Title VII sexual harassment claim based on hostile work environment, the plaintiff-employee must show: (1) that she belongs to a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action.[94]  To affect a term, condition, or privilege of employment, the harassment must be "sufficiently severe or pervasive so as to alter the conditions of the [plaintiff's] employment and create an abusive working environment."[95] The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[96] UP only challenges the fifth element of Hooge's Title VII claim, ostensibly conceding the first four elements; consequently, the Court's analysis of UP's *Motion* shall only evaluate if there is a genuine issue of material fact as to the fifth element.

As set forth above, the fifth element of a *prima facie* case of hostile work environment that a plaintiff must establish is that the employer knew or should have known of the harassment and failed to take prompt remedial action. However, in cases

---

[93] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).

[94] *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 298 (5th Cir. 2001) (citing *Shepherd v. Comptroller of Public Accounts of the State of Tex.*, 168 F.3d 871, 873 (5th Cir. 1999)).

[95] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

[96] *Aryain v. Wal–Mart Stores of Tex., LP,* 534 F.3d 473, 479 (5th Cir. 2008) (quoting *Faragher,* 524 U.S. at 786).

60029

where the alleged harasser is a supervisor, the employee need only satisfy the first four elements of the foregoing test.[97]

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.[98]

An employee is a supervisor if "he or she is empowered by the employer to take tangible employment actions against the victim."[99] A tangible employment action is any "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[100]

It is undisputed that Blackmon was Hooge's supervisor, and because the Court has found a genuine issue of material fact as to whether LRA and UP are a single employer, Blackmon's conduct as a supervisor is attributable to both LRA and UP for the purposes of summary judgment. Notwithstanding Hooge's complaint that UP argues she

---

[97] *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). This is based on the decisions of *Burlington Ind. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).
[98] *Vance*, 570 U.S. at 424 (citing *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765).
[99] *Boh Bros*, 731 F.3d at 452-53.
[100] *Ellerth*, 524 U.S. at 761.
60029

resigned instead of being terminated,[101] UP argues the fifth element is met because UP did not know about Hooge's sexual harassment allegations until May 30, 2017, and once UP became aware, it took appropriate action.[102] Hooge has presented summary judgment evidence from which the trier of fact could reasonably conclude that she was terminated by Blackmon and Tessier.[103] Thus, the Court finds that Hooge has met her burden of demonstrating a genuine issue of material fact as to whether a tangible employment action was taken against her for which her employers are strictly liable. UP's affirmative defense argument is therefore ineffective and need not be considered.

For these reasons, the *Motion for Summary Judgment* filed by UP shall be DENIED.

### D. Blackmon and LRA's Motion for Summary Judgment

Title VII only applies to employers with fifteen or more employees. It is undisputed that LRA has less than fifteen employees. Blackmon and LRA contend that both Hooge's joint employer and single employer arguments fail and that LRA is not an employer subject to Title VII because it does not meet Title VII's numerosity requirement. Blackmon and LRA also argue that LRA is a sole proprietorship that lacks the capacity to be sued. In response, Hooge argues that Blackmon and LRA, as well as UP, are a single integrated enterprise, or in the alternative, joint employers.[104] Regarding numerosity, Hooge argues

---

[101] Rec. Doc. 35 p. 17.
[102] Rec. Doc. 30-1 p. 19-20.
[103] Rec. Doc. 35 p. 17-18 (citing Rec. Doc. 35-2 p. 35-36, 63-64, 131; Rec. Doc. 35-3 p. 16-19, 60, 68; Rec. Doc. 35-9).
[104] Rec. Doc. 42 p. 5.
60029

that "the employees of all three Defendants should be cumulated for purposes of determining whether Title VII's numerosity requirement has been satisfied."[105]

### 1. Juridical Personality of LRA

Blackmon and LRA argue that LRA is a sole proprietorship which, in Louisiana, lacks the capacity to sue and be sued.[106] Hooge responds by arguing that LRA is an unincorporated association that is governed by an Executive Committee made up of representatives of member railroads.[107] Hooge directs the court to *La. Dep't of Agric. & Forestry v. La. R.R. Ass'n*, where a different section of this Court held that "the LRA is a trade association and its members are Class I and short line railroads operating in Louisiana."[108] Hooge offers Blackmon's deposition as summary judgment evidence, where Blackmon testified that the LRA is a trade association with representational standing.[109] The Court abides by the precedent set in *La. Dep't of Agric. & Forestry v. La. R.R. Ass'n* and finds that the LRA is an unincorporated trade association that possesses representational standing for the same reasons set forth in that case.[110] LRA therefore has capacity to sue and be sued.

### 2. Numerosity Requirement Under Title VII

As argued by UP, LRA and Blackmon contend that the LRA and UP are not a single employer or joint employers of Hooge.[111] Thus, the numerosity requirement of Title

---

[105] *Id.* at p. 7.
[106] Rec. Doc. 36-1 p. 10.
[107] Rec. Doc. 42 p. 6.
[108] 2010 WL 4393899 at *4 (M.D. La. Oct. 1, 2010) (Riedlinger, M.J.), *report and recommendation adopted*, 2010 WL 4432382 (M.D. La. Nov. 1, 2010) (Jackson, J.).
[109] Rec. Doc. 42 p. 7 (citing Rec. Doc. 35-6 p. 84-85).
[110] 2010 WL 4393899 at *4.
[111] Rec. Doc. 36-1 p. 12-18.
60029

VII is not met because LRA does not have fifteen employees.[112] Title VII defines an employer as "[a] person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."[113]

The Court found *supra* that Hooge has demonstrated a genuine issue of material fact as to whether UP and LRA are a single employer. Nonetheless, Blackmon and LRA argue that, even as a single employer, the numerosity test is not met because there is no "logical justification for adding together all of the employees of both 'employers,' unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other."[114] The entirety of Blackmon's and LRA's argument addresses aggregation of employees under the joint employer test, but nowhere do Blackmon and LRA argue that the numerosity requirement is not met if UP and LRA are considered to be a single employer. Indeed, the case law relied upon by Blackmon and LRA provides as follows:

> Aggregation of employees under the joint employer doctrine would function quite differently from aggregation of employees under the single employer doctrine. In the single employer context, the court draws the conclusion that, although nominally and technically distinct, several entities are properly seen as a single integrated entity. Accordingly all the employees of the constituent entities are employees of the overarching integrated entity, and all of those employees may be aggregated to determine whether it employs fifteen employees. In contrast, when the circumstances of one employee's employment justify the conclusion that she is being employed jointly by two distinct employers, it does not follow that all the employees of both employers are part of an

---

[112] *Id.* at p. 10-11.
[113] 42 U.S.C. § 2000(e)(b).
[114] Rec. Doc. 36-1 p. 18-19 (citing *Arculeo v. On-Site Sales & Marketing, LLC*, 425 F.3d 193 (2d Cir. 2005); *Sanford v. Main Street Baptist Church Manor, Inc.*, 327 Fed.Appx. 587 (6th Cir. 2009)).

60029

integrated entity encompassing both. A joint undertaking by two entities with respect to employment may furnish justification for adding to the employees of one employer those employees of another who are jointly employed by the first, but such joint undertaking does not furnish logical justification for adding together all the employees of both employers, unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other.[115]

The case law relied upon by Blackmon and LRA indicates that aggregation under the single employer test would include the total number of employees of the single enterprise. There is no disagreement that, if all of UP's employees are aggregated with LRA's employees, the numerosity requirement is met, and aggregation of employees is permitted when two employers are found to constitute a single enterprise.[116] Consequently, because the Court previously found that Hooge has shown a genuine issue of material fact as to whether UP and LRA are a single employer, the numbers of employees for both entities may be aggregated by the Court to meet Title VII's numerosity requirement on summary judgment. Blackmon and LRA do not dispute the other elements of Hooge's Title VII claim and Hooge has offered summary judgment evidence to support the remaining elements of her Title VII sexual harassment claim.[117]

For these reasons, the *Motion for Summary Judgment* filed by Blackmon and LRA shall be DENIED.

---

[115] *Arculeo*, 425 F.3d at 199.

[116] *See Guillory v. Rainbow Chrysler Dodge Jeep, LLC*, 158 F. Appx. 536 (5th Cir. 2005). *See also Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, 2020 WL 1248263, at *8 (W.D. Tex. Mar. 16, 2020) ("Numerous cases allow aggregation under a single integrated enterprise (single employer) theory as set forth in Trevino v. Celanese Corp., 701 F.2d 397 (5th Cir. 1983) to expose to liability an entity who does not meet the numerosity requirement alone.").

[117] *Id.* at p. 10-14.

60029

### III.    CONCLUSION

For the reasons set forth above, UP's *Motion for Summary Judgment*[118] is

**DENIED**, and Blackmon and LRA's Motion for Summary Judgment[119] is **DENIED**.

**IT IS SO ORDERED.**

In Baton Rouge, Louisiana on this 9th day of <u>June, 2020</u>.


_____

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[118] Rec. Doc. 30.
[119] Rec. Doc. 36.
60029